UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| IN RE: TEXAS ASSOCIATION OF PUBLIC SCHOOLS PROPERTY AND LIABILITY FUND,<br><br>*Debtor*,<br><br>TEXAS ASSOCIATION OF PUBLIC SCHOOLS PROPERTY AND LIABILITY FUND,<br><br>*Appellant*,<br><br>v.<br><br>WHITE DEER INDEPENDENT SCHOOL DISTRICT,<br><br>*Appellees*. | Civil Action No. SA-18-CV-985-XR<br>Bkr. Adv. Case No. SA-18-5017-RBK |

## ORDER

This civil action is before the Court on appeal from the United States Bankruptcy Court for the Western District of Texas. For the reasons stated below, the judgment of the bankruptcy court is REVERSED.

## BACKGROUND

This case comes before the Court on appeal from two orders of the bankruptcy court regarding the parties' respective motions for summary judgment. Texas Association of Public Schools Property and Liability Fund ("TAPS") appeals the following orders of the Bankruptcy Court: (1) the order denying TAPS's Motion for Summary Judgment (docket no. 3 at 7); and (2) the order granting White Deer Independent School District's ("White Deer") Motion for Summary Judgment (docket no. 3 at 11).

1

This case stems from TAPS' choice not to defend or indemnify White Deer in a state-court tax suit. In that tax suit, *Kelly Martin v. White Deer Independent School District*, Cause No. 11807, Judicial District Court for Carson County, Texas ("Tax Suit"), Kelly Martin sued White Deer, alleging that it improperly applied tax laws and charged her excessive taxes.

The Tax Suit turned on changes to Texas's homestead exemption for property taxes. Before 2015, the first $15,000 of a homestead's value was tax exempt under Texas law, and local governments could reduce this exemption using a Local Option Home Exemption ("LOHE"). On June 15, 2015, the governor signed S.B. 1, which raised the exemption to $25,000 and barred local governments from reducing or repealing any LOHE until 2019. This change required approval by constitutional amendment. On June 30, 2015, White Deer lowered its 2014 LOHE. Then, in November 2015, S.B. 1 was approved by constitutional amendment. Meanwhile, White Deer collected Martin's taxes under the reduced LOHE (which was lawful when enacted), prompting Martin to bring the Tax Suit in 2016.

Martin sued White Deer, its board of trustees, its superintendent, and the county tax assessor. Docket no. 3 at 96. She alleged the defendants acted illegally in reducing the LOHE and then collecting higher taxes. *Id.* at 103. She thus sought declaratory relief that these actions were *ultra vires* and violated the Texas Constitution, a permanent injunction to reinstate White Deer's 2014 LOHE, and a "refund of illegally collected taxes which [Martin] paid to the school district as a result of duress." *Id.* at 97. At summary judgment in that case, White Deer argued that Martin's requested declaratory relief was barred by its governmental immunity against suits for money damages. *Id.* at 394. Martin denied that she sought money damages, contending that she demanded "only a refund of illegally collected taxes paid under duress," which are not "'money damages' precluded by governmental or official immunity." *Id.* at 415.

In April 2018, the state court dismissed the individual defendants and granted summary judgment in Martin's favor. *Id.* at 429. Martin was granted declaratory relief that S.B. 1 was constitutional and prohibited repealing or barring the LOHE between 2015 and 2019, that White Deer violated S.B. 1, and that White Deer's reduction of the LOHE was void. *Id.* at 430. The state court ordered that White Deer "disgorge and refund to [Martin] those property taxes that it collected for tax years 2015, 2016, and 2017 from [Martin], if any, that are subject to the [LOHE] that it adopted for the 2014 tax year." *Id.* at 430-31. The pending appeal of the Tax Suit was filed May 7, 2018. *Id.* at 432.

TAPS is a self-funded risk program from which White Deer had previously purchased a policy; the section of this policy at issue here is titled "Educators' Legal Liability Cover." In response to the Tax Suit, White Deer submitted a claim to TAPS under this policy for defense and indemnification of the Tax Suit. On October 7, 2016, TAPS denied coverage. White Deer then brought this suit in state court, seeking declaratory and injunctive relief on the duties to defend and indemnify and damages for breach of contract and violation of the Texas Deceptive Trade Practices Act. TAPS removed to federal court and the case was transferred to bankruptcy court.[1] There, the parties filed cross motions for summary judgment; the bankruptcy court granted White Deer's motion and denied TAPS' motion. TAPS then appealed these orders to this Court.

## DISCUSSION

### I. Appellant's Issues on Appeal

TAPS's issues on appeal are:

(1) Whether the bankruptcy court erred in granting White Deer's motion for summary judgment and denying TAPS's motion.

---

[1] TAPS entered bankruptcy proceedings (Bankr. Case No. 17-52437-RBK) on October 18, 2017.

(2) Whether the bankruptcy court erred in granting summary judgment that TAPS owed White Deer a duty to defend the underlying suit.

(3) Whether any duty to indemnify White Deer is nonjusticiable because the issue is premature until the underlying judgment is final and the appeal is exhausted.

(4) Whether the bankruptcy court erred in granting summary judgment that TAPS owed White Deer a duty to indemnify Whiter Deer for any part of the judgment in the underlying suit.

(5) Whether the bankruptcy court erred in failing to grant summary judgment dismissing White Deer's claims for declaratory relief, injunctive relief, breach of contract, and attorney's fees.

(6) Whether TAPS may contest coverage only upon the grounds identified by its letter denying coverage.

(7) Whether the bankruptcy court erred in granting summary judgment that White Deer recover attorney's fees.

(8) Whether the bankruptcy court erred in failing to grant summary judgment dismissing White Deer's DTPA claims.

Docket no. 6 at 14.

Although TAPS lists eight issues on appeal, the base issue is whether the bankruptcy court erred in granting White Deer's Motion for Summary Judgment and denying TAPS's Motion for Summary Judgment. Accounting for redundancy in the above issues, the Court must consider the following questions to decide this appeal:

(1) Whether the bankruptcy court erred in granting summary judgment that TAPS owed White Deer a duty to defend the underlying Tax Suit.

4

(2) Whether the bankruptcy court erred in granting summary judgment that TAPS owed White Deer a duty to indemnify White Deer for any part of the judgment in the underlying suit.

(3) Whether the bankruptcy court erred in denying TAPS' no-evidence summary judgment motion on White Deer's DTPA claims.

(4) Whether the bankruptcy court erred in granting White Deer's summary judgment motion for attorney's fees.

## II. Appellate Standard of Review

A district court has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges. *See* 28 U.S.C. § 158(a). On appeal, a bankruptcy judge's conclusions of law are reviewed *de novo*, whereas findings of fact will not be set aside unless they are found to be clearly erroneous. *In re National Gypsum Co.*, 208 F.3d 498, 503 (5th Cir. 2000). The district court reviews mixed questions of law and fact *de novo*. *Id.*

The court reviews discretionary decisions of the bankruptcy court for abuse of discretion. *See Mendoza v. Temple-Inland Mortgage Corp. (In re Mendoza)*, 111 F.3d 1264, 1270 (5th Cir. 1997). A bankruptcy court abuses its discretion when "its ruling is based on an erroneous review of the law or on a clearly erroneous assessment of the evidence." *In re Yorkshire, LLC*, 540 F.3d 328, 331 (5th Cir. 2008) (quoting *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir.1995)).

## III. Review of the Bankruptcy Court's Orders

The bankruptcy court granted White Deer's Motion for Summary Judgment (and denied TAPS's), concluding that TAPS had a duty to defend and indemnify White Deer, that TAPS's denial of coverage constituted a violation of the Texas Deceptive Trade Practices Act (DTPA), and that White Deer was entitled to attorney's fees. TAPS appeals these conclusions.

5

### a. Legal Standard

Texas's rules of contract construction govern this diversity case. *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995). Under Texas law, the usual principles of contract law apply to insurance policies. *American States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998). The construction of an insurance policy is a question of law. *Stumph v. Dallas Fire Ins*. Co., 34 S.W.3d 722, 729 (Tex. App.—Austin 2000, no pet.) (citing *Coker v. Coker*, 650 S.W.2d 393-94 (Tex. 1983)).

### b. Applicable Policy Provisions

The relevant policy provisions are in a document titled "TEXAS ASSOCIATION OF PUBLIC SCHOOLS PROPERTY AND LIABILITY FUND COVERAGE DOCUMENT." Docket no. 3 at 310-15. The section at issue is titled "EDUCATORS' LEGAL LIABILITY COVER." *Id.* at 310. Under "COVERAGE," the document states (1) "[t]he Fund will pay, on behalf of the member, loss resulting from a claim for a wrongful act first made against the member during the coverage period . . . ." and (2) "[t]he Fund has the right and duty to investigate, defend and conduct settlement negotiations in any claim or suit, if such claim or suit alleges a wrongful act covered under this coverage part." *Id.*

The relevant terms are defined as follows:

- "Fund" is defined as TAPS, *id.*, and no party disputes that White Deer is a "member" as defined in the policy, *id.* at 311.

- The definition of "claim" relevant here is "[a]ny judicial . . . proceeding initiated against any members seeking to hold such member responsible for a wrongful act through monetary damages, other than attorney's fees or court costs alone, including any appeal therefrom." *Id.*

- "Loss means damages and settlements; but does not include . . . criminal or civil fines, penalties imposed by law, taxes, matters deemed uninsurable under the law pursuant to which the Coverage Document shall be construed, or compensation earned in the course of employment by an employee but not paid by the member entity . . . ." *Id.*
- "Wrongful act means . . . [a]n actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the member in the discharge of their duties, including but not limited to that injury to a person that results from any one or more of the following offenses: refusal to employ; termination of employment; demotion or failure to promote; negative evaluation; reassignment; discipline; defamation or humiliation based on discrimination directed at that person; coercing the person to commit an unlawful act or omission (within the scope of employment); work-related sexual harassment; or other work-related harassment because of race, color, national origin, religion, gender, marital status, age, sexual orientation, physical or mental condition or any other protected class or characteristic. But Wrongful Act does not mean (include) any Claim by a Member's student for discrimination or violation of civil rights 13 [including but not limited to Title IX, Section 1983, or similar statutes] as a result of sexual harassment, sexual assault, sexual or physical abuse, sexual molestation, or the use of corporal punishment." *Id.*
- "Wrongful Employment Practice means a Wrongful Act arising out of the employment relationship."

The policy also includes several exclusions; TAPS argues two are relevant here. The first, the "dishonest act exclusion," states: "The Fund will not pay loss nor provide a defense resulting from any claim under this coverage part based upon, rising out of, directly or indirectly resulting

7

from or in consequence of, or in any way involving: . . . . Any claim brought about or contributed to by any dishonest, fraudulent or criminal wrongful act of a member." *Id.* at 311-12. The second, the "personal profit" exclusion, states: "The Fund shall not be liable to pay loss resulting from any claim: . . . . Based upon or attributable to a member gaining in fact any profit, remuneration, or advantage to which such member was not legally entitled." *Id.* at 312.

### c. TAPS's Duty to Defend White Deer in the Underlying Tax Suit

TAPS argues that it has no duty to defend White Deer in the Tax Suit for several reasons. The arguments determinative here are that Martin, the plaintiff in that suit, did not allege a "claim" under the policy, which must seek to hold White Deer responsible for "monetary damages," and even if she did allege a claim she did not allege a "wrongful act" as that term is defined in the policy.[2]

#### i. Legal Standard

Under Texas law, an insurer's duty to defend is distinct from its duty to indemnify. *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009). The "eight corners" rule, which limits the factfinder's inquiry to the allegations in the complaint and the terms of the insurance policy, determines the duty to defend. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 701 (5th Cir. 1996). An insurer has a duty to defend only when the facts

---

[2] First, the Court identifies a threshold issue best considered before turning to the parties' principal arguments on the duty to defend: whether TAPS's reasons for denying coverage are limited to the reasons set out in its denial letter. TAPS lists this question as its sixth issue on appeal. TAPS contends that White Deer's "coverage analysis tacitly assumes that the coverage dispute is limited to the grounds in TAPS's denial letter," but argues that "the denial letter did not waive or estop TAPS from arguing any reason that coverage does not exist." Docket no. 6 at 32. TAPS argues that, under Texas law, "waiver and estoppel cannot be used to re-write a policy to provide contractual coverage for risks not insured." *Id.* (citing *Ulico Cas. Co. v. Allied Pilots Association*, 262 S.W.3d 773, 787 (Tex. 2008) and *Texas Farmers Ins. Co. v. McGuire*, 744 S.W.2d 601, 602-03 (Tex. 1988)).
   White Deer, in response, does not dispute TAPS's assessment of the law but instead argues that TAPS did not raise this issue at summary judgment and thus waived it. Docket no. 7 at 28. As TAPS notes in reply, however, it did raise this argument below. Docket no. 9 at 20 (citing docket no. 3 at 620-21). Thus, TAPS's denial letter does not now limit its arguments for denying coverage.

alleged in the complaint, if taken as true, have the potential to state a cause of action that falls within the policy. *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.*, 762 F.2d 1239, 1243 (5th Cir.), *amended on other grounds*, 768 F.2d 89 (5th Cir. 1985). "The court must focus on the facts alleged that show the origin of the damages in the most recent complaint of the underlying litigation, and not on the legal theories or conclusions asserted." *Indian Harbor Ins. Co. v. KB Lone Star, Inc.*, No. H-11-CV-1846, 2012 WL 3866858, at *5 (S.D. Tex. Sept. 5, 2012) (citing *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)). The truth or falsity of the complaint's allegations is not relevant, and the allegations against the insured are liberally construed in favor of coverage. *Id*. There is a duty to defend if the third-party plaintiff's factual allegations in the underlying suit "potentially support a covered claim." *See Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008).

The insured has the burden of establishing that the claim falls within the policy, and the insurer has the burden of establishing that an exclusion in the policy avoids or defeats coverage. *Canutillo*, 99 F.3d at 701. If the insurer shows that an exclusion applies, the burden shifts again and the insured must show that an exception to the exclusion brings the claim back within coverage. *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). The Court liberally construes any ambiguities in the policy in the insured's favor. *Canutillo*, 99 F.3d at 701. If the policy is not ambiguous, however, the factfinder must apply the one reasonable construction of the policy. *Id*.

### ii. The First Four Corners: The Underlying Lawsuit

The first step in applying the law to the facts in this case is to examine Martin's Tax Suit pleadings. Martin alleges White Deer, in violation of S.B.1, "refused to certify its local option homestead exemption amount for subsequent tax years (including the 2015 and 2016 tax years)"

9

and has not "reinstated the exemption." Docket no. 3 at 103. Further, White Deer "illegally assessed and collected taxes that are subject to this exemption." *Id.* Martin alleges these actions "in repealing the exemption, refusing to grant [Martin] the exemption, and assessing and collecting taxes that are subject to the exemption were *ultra vires.*" *Id.* She alleges White Deer has "taken and deprived [her] of a constitutionally protected right through [its] arbitrary and capricious use of power and failed to provide [Martin] constitutionally sufficient notice and hearing." *Id.*

Martin further alleges that White Deer's actions "caused [Martin] to suffer an actual, concrete, and particularized injury." *Id.* at 104. She alleges her homestead residence is within White Deer's boundaries and White Deer imposes ad valorem taxes on her. *Id.* And although she was allegedly entitled under S.B. 1 to the 2014 LOHE, White Deer allegedly deprived Martin of her entitlement to the exemption and to her money and "caus[ed] [Martin] to pay taxes under duress in order to avoid incurring penalties and interest imposed by the Texas Tax Code for nonpayment of such taxes." *Id.* Thus, Martin alleges she lost the 2014 LOHE because of White Deer's misconduct, which "has placed undue stress on [Martin's] personal ability to conserve or apply her financial resources as she so needs or desires." *Id.*

As relief, she sought declarations that the change in Texas law was constitutional and that it prohibited school districts from repealing or reducing their 2014 LOHEs between 2015 and 2019. *Id.* at 105. She also sought declarations that White Deer's actions were *ultra vires*. *Id.* Further, and crucially for purposes of this order, she sought "judgment awarding her a refund of the taxes collected by Defendants that were subject to the local option homestead exemption that Defendants wrongfully repealed." *Id.* She again alleges she paid these taxes under duress and alleges they "were illegally taken and collected by Defendants, thus entitling [Martin] to a refund." *Id.*

10

### iii. The Second Four Corners: The Policy

Now, the Court must decide whether the facts in Martin's pleadings, accepted as true, constitute a covered claim.

### 1. Relief Sought

TAPS argues that the relief Martin sought in her pleadings is not the sort of relief for which TAPS must defend policy holders, as the Tax Suit is not a "claim" or "loss" under the policy and it falls under the exclusion for non-pecuniary relief.

First, a qualifying "claim" is one that seeks to hold a "member responsible for a wrongful act **through monetary damages, other than attorney's fees or court costs alone**[.]" Docket no. 3 at 311 (emphasis added). As a preliminary matter, no party disputes that the injunctive and declaratory relief Martin sought does not trigger a duty to defend, under this and other provisions in the policy. The inquiry must center on Martin's desired tax refund. If that refund is not "monetary damages," then, Martin's Tax Suit is not a qualifying "claim" under the policy and TAPS has no duty to defend. A proper "claim," as the policy defines it, is necessary whether White Deer seeks coverage under the first ("The Fund will pay . . . loss resulting from a claim for a wrongful act . . .") or second ("The Fund has the . . . duty to . . . defend . . . in any claim or suit, if such claim or suit alleges a wrongful act . . .") provision. *See* docket no. 3 at 310.

Second, a qualifying "loss" includes "**damages** and settlements." Docket no. 3 at 311 (emphasis added). This definition also excludes particular types of damages and settlements, including, as argued by TAPS on appeal, "taxes" and "matters deemed uninsurable under the law pursuant to which the Coverage Document shall be construed[.]" *Id.* For these exceptions to the definition to be relevant, the desired tax refund must first be "damages." The Court can find no

guiding principle that would distinguish between "damages" and "monetary damages" in this instance.

TAPS argues the plain meaning of these terms in the insurance context is legal damages, not money awarded as restitution or disgorgement, which is equitable monetary relief. Docket no. 6 at 33. TAPS contends "[t]he terms 'damages' and 'money damages' are not ambiguous; their plain meaning as used in the insurance context refers to legal damages and does not include equitable monetary relief." *Id.* Whether a tax refund is "monetary damages" (as required for a qualifying claim under the policy) and whether it is "damages" (as required for a qualifying loss) are separate arguments on the duty to defend, but in this case the answer will be the same. The cases TAPS cites—*Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 493-94 (Tex. Civ. App.—Dallas 1970, no writ) and *In re TransTexas Gas Corp.*, 597 F.3d 298, 310 (5th Cir. 2010)—bear on both issues. Thus, if Martin's desired tax refund is not damages, TAPS will have no duty to defend because the Tax Suit is not a qualifying claim and because White Deer's refund of illegally acquired tax funds is not a qualifying loss.

Responding to TAPS's argument that a tax refund is not monetary damages, White Deer does not address TAPS's cited cases but instead argues that "[t]he only limitation in the Policy with regard to monetary damages" is that a qualifying claim must be for "monetary damages, *other than attorney's fees or court costs alone*." Docket no. 7 at 17 (emphasis in original). Because the Tax Suit "is not for attorney's fees and costs alone," then, White Deer argues it must be for qualifying monetary damages. *Id.* This does not follow. If the tax refund constitutes monetary damages, then it would matter whether these damages went beyond attorney's fees and court costs (as they surely would). But if the tax refund is not monetary damages at all—as TAPS argues and

the Court now considers—White Deer's argument has no bearing. Thus, the Court turns to the cases.

In *Nortex*, Humble Oil & Refining Co. sued Nortex because Nortex's slant drilling extended into adjacent leases owned by Humble. *Nortex*, 456 S.W.2d at 490. Humble claimed Nortex converted its property by wrongfully appropriating and selling oil belonging to it. *Id.* After the parties settled, Nortex sought indemnity from its insurer, claiming that the settlement was a "Loss" under its policy; the insurer refused payment. *Id.* at 490–91. Nortex sued, and the Texas appellate court, reversing the court below, stated:

> When Nortex settled the claims of Humble and Texaco it did not sustain a 'loss' within the meaning of the insurance contract; it was merely paying for oil it had removed and sold from the land of Humble and Texaco. An insured (under such a policy as we have here) does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired . . . . The insurer did not contract to indemnify the insured for disgorging that to which it was not entitled in the first place, or for being deprived of profits to which it was not entitled.

*Id.* at 493–94.

In *In re TransTexas Gas Corp.*, U.S. Bank successfully avoided at the bankruptcy court severance payments owed to TransTexas's founder, John Stanley, on the grounds that they were fraudulent transfers and unlawful preferences. 597 F.3d 298, 303. The insurer, National Union, then sought declaratory judgment that this bankruptcy court judgment against Stanley was not a "loss" under the policy. *Id.* On appeal, the Fifth Circuit, relying on *Nortex* and *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908 (7th Cir. 2001), concluded that "[p]ayments fraudulent as to creditors that must therefore be repaid due to bankruptcy court order is a disgorgement of ill-gotten gains and a restitutionary payment." *Id.* at 310. Because "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain," the judgment against Stanley was not a loss under the policy. *Id.* (quoting *Level 3*, 272 F.3d at 911). The Fifth Circuit

13

further quoted *Level 3* for the proposition that an "insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *Id*.

Here, Martin's petition indicates she seeks a refund of illegally collected taxes. Like the relief at issue in *TransTexas* and *Nortex*, Martin's desired tax refund is "restoration of an ill-gotten gain," not damages under Texas law. Based on these authorities—and forced as the Court is, at this stage, to accept Martin's pleaded facts as true—the Court can only conclude that a refund of illegally acquired taxes is not "damages" or "monetary damages," but is instead equitable relief.

Another case that arises from similar facts (indeed, the same change in Texas law that sparked Martin's suit) supports this conclusion. *See Kilgore Indep. School Dist. v. Axberg*, 535 S.W.3d 21 (Tex. App.—Texarkana 2017, no pet.). In *Kilgore*, taxpayers sued a school district, alleging that the district illegally repealed its 2014 LOHE. The *Kilgore* court considered whether the school district was immune to the plaintiffs' suit. The issue was whether the plaintiffs sought money damages, given that a "party cannot circumvent governmental immunity by characterizing a suit for money damages as a claim for declaratory judgment." *Id.* (quoting *City of Dallas v. Albert*, 354 S.W.3d 368, 378 (Tex. 2011)). The petition indicated it sought "monetary relief in the amount of $100,000 or less." Although this, "standing alone, could be construed to request money damages, [plaintiffs'] subsequent pleadings and arguments have clarified that request to be limited to a return of taxes." *Id.* Reversing the court below, the *Kilgore* court concluded that "the only money [plaintiff] seeks is the repayment of taxes allegedly paid under duress" and "such relief is equitable and not barred by immunity."

As did the petition in *Kilgore*, Martin's petition indicates that she seeks "monetary relief in the amount of $100,000 or less." The *Kilgore* court stated that, standing alone, this could indicate

14

the plaintiff sought money damages, but in *Kilgore* further argument clarified that the plaintiff only sought a tax refund. TAPS points to Martin's arguments made in the course of litigation, noting that Martin's response to a summary judgment motion in the Tax Suit claims her desired tax refund is not money damages. Docket no. 6 at 19. TAPS then argues that Martin's analysis, as "author of the alleged facts," should control here. *Id.* But this argument violates the "eight corners" rule TAPS urges the Court to apply—in determining the duty to defend, Martin's pleadings matter, but her subsequent arguments made in litigation do not.

Still, the Court concludes that, even without further clarification, Martin's petition unambiguously seeks a tax refund only. Her reference to "monetary relief in the amount of $100,000 or less and non-monetary relief" merely fulfills a requirement of Texas pleading. *See* TEX. R. CIV. P. 47(c). As did the *Kilgore* court, this Court concludes that this sort of tax refund is equitable relief, not money damages. The Tax Suit is thus not a qualifying claim under the policy at issue here, nor is restitution of this money a qualifying loss, and TAPS has no duty to defend. This may be artful pleading on Martin's part, as White Deer argues, since she presumably knows that sovereign immunity poses an obstacle to her claim, but White Deer cites no authority that indicates Texas has an artful pleading exception to the "eight corners" rule, and the Court is aware of no such exception.

Because of this conclusion, the Court need not consider TAPS's other arguments about the relief requested—namely, whether a tax refund is otherwise not a loss because it is "taxes" or a matter "deemed uninsurable under the law," or alternatively whether the Tax Suit falls under the policy's non-pecuniary relief exclusion.

15

## 2. "Wrongful Act"

Even assuming for argument that Martin's desired tax refund was damages, making the Tax Suit a "claim" under the policy, TAPS still has no duty to defend because the Tax Suit does not allege a "wrongful act."

The policy defines "wrongful act" as

> [a]n actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the member in the discharge of their duties, including but not limited to that injury to a person that results from any one or more of the following offenses: refusal to employ; termination of employment; demotion or failure to promote; negative evaluation; reassignment; discipline; defamation or humiliation based on discrimination directed at that person; coercing the person to commit an unlawful act or omission (within the scope of employment); work-related sexual harassment; or other work-related harassment because of race, color, national origin, religion, gender, marital status, age, sexual orientation, physical or mental condition or any other protected class or characteristic.

Docket no. 3 at 311.

TAPS argues that the policy limits "wrongful act" to employment practices, given that each of the nine laundry list items refers to an employment act or decision. Docket no. 6 at 23-24. Under the rule of *ejusdem generis*, "when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation." *Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003). Here, the laundry list includes only employment-related practices, and the generic terms preceding the list—such as "act" and "error"—are restricted accordingly. If this were a close question, the Court would decide it in White Deer's favor, given that Texas law liberally construes the duty to defend in the insured's favor. But whatever the exact scope of this "wrongful act" provision, White Deer's acts related to its tax-collecting duties clearly fall outside it.

White Deer argues that the "wrongful act" definition is not limited to employment-related acts because of the "including but not limited to" language and because the policy separately defines "wrongful employment practice" as a "wrongful act arising out of the employment relationship." Docket no. 7 at 20. White Deer argues that a construction limiting "wrongful act" to employment practices renders the "wrongful employment practice" term redundant.

On this point, however, TAPS has the better argument. This policy section excludes personal or advertising injury (except employment-related wrongful acts), docket no. 3 at 311, and any claim for which coverage is sought under the General Liability coverage part of the policy (which covers bodily injury, property damage, and personal and advertising injuries), *id.* at 312. As TAPS correctly argues, harmonizing these exclusions with the "wrongful act" definition leads to this conclusion:

> By applying the express terms, 'wrongful act' excludes claims for bodily injury, property damage, or personal injury, unless the claim falls within the definition of 'wrongful employment practice.' Between the two exclusions and the enumerated list of wrongful acts, the only sensible construction is that 'wrongful act' is limited to acts as an employer *vis a vis* employees.

Docket no. 6 at 25.

Although it is true that the policy does not limit "wrongful act" to the laundry list, it would stretch this term too far—given the focus of the policy section generally—to conclude that illegal tax collection is a "wrongful act" as the policy defines it. Construing the policy as a whole, the Court concludes that White Deer's alleged acts in collecting taxes are not contemplated by the "Educators' Legal Liability Cover" policy section at issue here. Thus, TAPS has no duty to defend. Given the Court's construction of "claim" and "wrongful act," it need not consider TAPS's argument that the Tax Suit falls under the dishonest act exclusion. Accordingly, the Court

concludes that the bankruptcy court erred in granting summary judgment in White Deer's favor on TAPS's duty to defend.

### d. TAPS' Duty to Indemnify White Deer for Judgment in the Tax Suit

TAPS also challenges the bankruptcy court's grant of summary judgment for White Deer on TAPS's duty to indemnify. Because the same reasons that negate the duty to defend also negate any possible duty to indemnify, the Court reverses on this point.

#### i. Legal Standard

In contrast to the the duty to defend, which is based solely on the allegations of the complaint and the insurance policy, the duty to indemnify is based on the facts of the underlying litigation, as proven at trial. *City of Coll. Station v. Star Ins. Co.*, 735 F.3d 332, 340 (5th Cir. 2013); *see also Canutillo*, 99 F.3d at 701. Consequently, the duty to indemnify is a narrower duty. *See Canutillo*, 99 F.3d at 701. "[T]he duty to indemnify is not dependent on the duty to defend and . . . an insurer may have a duty to indemnify its insured even if the duty to defend never arises." *D .R. Horton–Texas, Ltd. v. Markel Intern. Ins. Co., Ltd*., 300 S.W.3d 740, 741 (Tex. 2009).

An insurer with a duty to defend must defend the insured in a suit that "alleges and seeks damages for an event potentially covered by the policy," while the duty to indemnify means the insurer will "pay all covered claims and judgments against an insured." *Colony Ins. Co. v. Peachtree Const., Ltd*., 647 F.3d at 252–53 (5th Cir. 2011) (quoting *D.R. Horton–Texas*, 300 S.W.3d at 743)). "The difference between the two is a matter of timing." *Id*.

> The distinction between the duty to defend and the duty to indemnify is based upon the time when the duties are determined. The duty to defend arises prior to the completion of litigation, and therefore insurers are required to meet their defense obligation before the scope of the insured's liability has been determined. In contrast, the duty to indemnify arises only once liability has been conclusively determined. In other words, because the duty to defend arises whenever an insurer ascertains facts that give rise to the possibility or the potential liability to indemnify,

the duty to defend must be assessed at the very outset of a case, unlike the duty to indemnify, which arises only when the insured's underlying liability is established.

*Id*.

Thus, a duty to indemnify is usually only justiciable after the underlying litigation has been resolved. *Farmers Texas Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 83 (Tex. 1997). The policy coverage may turn on facts from the underlying lawsuit and, therefore, the duty to indemnify will be contingent on the findings. *See id.* at 84. However, an insurer's duty to indemnify can be determined with the pleadings alone if "the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Farmers Tex. County Mutual Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) This *Griffin* rule "cannot be construed . . . broadly," as it is only an exception to the general rule that the underlying suit must be resolved before indemnification is justiciable and only applies when there is "no conceivable set of facts" in the underlying suit that would support a finding of a duty to indemnify. *D.R. Horton–Texas*, 300 S.W.3d at 745.

### ii. Application

Here, application of the *Griffin* rule is appropriate. Even assuming that the Tax Suit litigation clarifies that Martin sought money damages, making the Tax Suit a qualifying claim and depriving White Deer of a qualifying loss, there is no conceivable set of facts that would turn White Deer's tax collection duties into a wrongful act as defined in the policy. Thus, the same reasons that negate the duty to defend negate the possibility that TAPS will have a duty to indemnify.

Even if the *Griffin* rule did not apply, the Court would still reverse on the duty to indemnify on justiciability grounds. Here, the Tax Suit is pending appeal and thus remains unresolved. At this stage, then, TAPS's duty to indemnify is not justiciable. *See Chartis Specialty Ins. Co. v. JSW*

19

*Steel (USA), Inc.*, 2015 WL 4378366, at *3 (S.D. Tex. July 8, 2015) ("Although the evidence presented at trial and the findings of the jury do not appear to trigger coverage, the Underlying Lawsuit is on appeal, and this court finds it prudent to stay this action until the Underlying Lawsuit is fully and finally resolved.")

Accordingly, the Court concludes that the bankruptcy court erred in granting summary judgment in White Deer's favor on TAPS's duty to indemnify.

### e. White Deer's DTPA Claims Related to TAPS's Denial of Coverage and White Deer's Attorney's Fees

Given this Court's reversal of the bankruptcy court on TAPS's duties to defend and indemnify, the Court also reverses the bankruptcy court's granting of White Deer's DTPA claims and attorney's fees, to the extent these decisions were premised on TAPS's violation of the policy.

## CONCLUSION

Having considered the parties' briefs and the record, the Court REVERSES the decision of the bankruptcy court and REMANDS this case for further proceedings consistent with this order. The clerk is directed to close this appeal.

It is so ORDERED.

SIGNED this 1st day of March, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE